1    **UNITED STATES DISTRICT COURT**

2    **EASTERN DISTRICT OF NORTH CAROLINA**

3

**UNITED STATES OF AMERICA,**      )

4                                   )

          **Plaintiff,**            )      DOCKET NO. 5:14-cr-0175-FL-1

5                                   )

      **vs.**                       )

6                                   )

**MARCUS WHITE,**                   )

7                                   )

          **Defendant.**           )

8    _____)

9

10              **TRANSCRIPT OF DETENTION HEARING**
              **BEFORE MAGISTRATE JUDGE JAMES E. GATES**

11              **THURSDAY, FEBRUARY 5, 2015; 10:23 A.M.**
                    **RALEIGH, NORTH CAROLINA**

12

13   **FOR THE PLAINTIFF:**
          United States Attorney's Office

14        By:  Rudy E. Renfer, AUSA
          310 New Bern Avenue, Suite 800

15        Raleigh, North Carolina  27601

16

17

18   Audio Operator:              COURT PERSONNEL

19

20        Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

21

22   _____

23                   **JANICE RUSSELL TRANSCRIPTS**
                        1133 TANAGER TRAIL

24              VIRGINIA BEACH, VIRGINIA  23451
                       (757) 422-9089

25                   trussell31@cox.net

1   **APPEARANCES** (Continued):

2   **FOR THE DEFENDANT:**
        Office of Federal Public Defender
3       By:  Jennifer Dominguez, AFPD
        150 Fayetteville St., Suite 450
4       Raleigh, NC  27601

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>I N D E X</u>

2
       Government's
3      Witnesses:              Direct    Cross     Redirect

4      Sean Collins             4        10

5
       Defendant's
6      Witnesses:

7      Regina White            17        23        26

8

9

10
       ARGUMENT:      Ms. Dominguez                           27
11
12     THE COURT:     Finding                                 30

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  This is the case of United States versus

3    Marcus White.  This matter is set for a detention hearing.

4              This is not a presumption case, meaning that the

5    burden of production at the outset rests with the Government.

6              So, Mr. Renfer, I'll be happy to entertain any

7    evidence the Government wishes to present, sir.

8              MR. RENFER:  Yes, Your Honor.

9              At this time the Government would call Sean Collins to

10   the stand.

11             SEAN COLLINS, GOVERNMENT'S WITNESS, SWORN

12             THE COURTROOM DEPUTY:  Thank you.  Have a seat and

13   state your name for the record, please.

14             THE WITNESS:  Sean Collins.

15                        DIRECT EXAMINATION

16   BY MR. RENFER:

17   Q    Sir, where are you currently employed?

18   A    I currently work for the Fayetteville Police Department.

19   I've been there since 1997.  I'm assigned to, currently

20   assigned to the Bureau of Alcohol, Tobacco, and Firearms Task

21   Force.

22   Q    And what are some of your duties and responsibilities?

23   A    I investigate crimes related to guns and drugs and gang

24   violence in Fayetteville that can potentially be prosecuted

25   federally.

1   Q   And as part of your duties and responsibilities are you

2   familiar with an investigation of the defendant, Marcus White?

3   A   I am.

4   Q   And does the date of that investigation include December 4,

5   2013?

6   A   Yes.

7   Q   Could you tell the Court what, if anything, happened with

8   regard to the defendant on December 4, 2013?

9   A   On that date, members of the Fayetteville Police Gun and

10  Gang Violence Unit were in the area of Bonnie Doone in

11  Fayetteville attempting to locate a subject who had a murder

12  warrant on him.  A plan was set into place to, to look for the

13  subject in some abandoned houses along Mike Street in Bonnie

14  Doone.

15      As the units pulled into the, the area to start looking for

16  the subject -- they were driving unmarked Dodge Chargers, which

17  are police vehicles, but they weren't painted with Police on

18  them -- when they pulled into the area a light in color Toyota

19  Scion left the area at a high rate of speed.  One of the

20  officers, Officer Dave Franklin, believed that the subject they

21  were looking for for the murder warrant might be in the vehicle

22  and attempted to conduct an investigative stop on the vehicle.

23  He described, while he was attempting to stop the vehicle, it'd

24  slow down almost to a stop and then accelerate rapidly, again,

25  slow down and accelerate.  He said this vehicle did this a

1   couple of times.

2       Once the vehicle finally stopped, it was about a quarter

3   mile from the area where it had originally been seen.  Officer

4   Franklin noticed when he approached the vehicle that the

5   driver, Mr. White, had a bag of .22 caliber shell casings in

6   the driver's side door.

7   Q   Now were they shell casings, or was it actual ammunition?

8   A   Actual ammunition.

9       He stated that the, the ammunition was clearly visible

10  through the bag, so he started to get the occupants out of the

11  vehicle and, and detain them.  Mr. White was found to be the

12  driver of that vehicle.  There were two other occupants in the

13  rear seat, an Xavier Johnson and a female named Jessica

14  Nicholson.  Both those occupants were found to have drugs in

15  their possession.

16      While Officer Franklin was conducting this vehicle stop,

17  the officers in the area, the traffic stop was close enough to

18  where they, where they were searching for the subject they

19  could walk to the traffic stop.  So as they were walking to the

20  traffic stop to assist Officer Franklin, Officer Armstead

21  located two firearms along the roadway.  He noted that the

22  firearms were, were dry, even though it had been raining, and

23  the foliage around them and the grass around the firearms was

24  wet.

25      So it appeared that the firearms had been recently

1  discarded.  He described --

2  Q    And to the best of your knowledge, was the location of

3  those firearms consistent with the location of where the car

4  had slowed down?

5  A    Yes.  It had -- it was in the direct path of where the

6  vehicle was.

7       The, the firearms were found to be a Ruger .22 caliber

8  semi-automatic pistol and a North American Arms revolver .22

9  caliber pistol.

10 Q    And what happened after that?

11 A    After that, all three of the subjects were brought back to

12 the police department to be interviewed.  Mr. White, who was

13 the driver, was transported by Officer Franklin and Special

14 Agent Johnson of the ATF.  On the way to the police department

15 Mr. White was given his Miranda warnings and was told by

16 Officer Franklin that -- that he's -- Officer Franklin told him

17 that he saw him throw the gun out of the vehicle.

18      The other two occupants were, were transported by other

19 officers and once they got down to the police department they

20 were all put into separate interview rooms and interviewed, or

21 attempted to be interviewed by the detectives.

22      Mr. White was interviewed first.  He was again -- they,

23 they asked him -- they let him know, "Hey, you were read your

24 Miranda warnings.  Do you still understand your rights?"  He

25 agreed to all that.  The interview was recorded.  During the

1  interview Mr. White stated that, that he did possess the Ruger

2  .22 caliber semi-automatic pistol and he told the officers,

3  Officer Franklin and Special Agent Johnson, that he received

4  the pistol from a subject named Cornelius Jackson, who was --

5  and he received it shortly before Mr. Jackson was murdered on

6  October 31st of 2013.  White knew a little bit about the gun.

7  He said that Jackson received the gun as a payment for a drug

8  debt from someone else.  White told the officers that he kept

9  the firearm when he was at home outside in the woods because he

10  knew he wasn't supposed to have it and while he was riding

11  around, he normally carried the gun and he carried it in his

12  waistband when he was driving.

13      More importantly, on that day Mr. White had the gun because

14  he knew he was going into the area where there had been some

15  recent murders and, and he wanted to have protection.

16  Q   And did he make any statements regarding how he obtained

17  the ammunition?

18  A   Yes.  He stated that when Jackson gave him the firearm he

19  also gave him the ammunition.

20  Q   And that was the bag of ammunition found in the driver's --

21  A   That Officer Franklin saw in the door panel of the vehicle.

22  Q   And the female passenger, what, if anything, did she say,

23  if you recall?

24  A   She did say that she -- she was immediately cooperative

25  after she was given her <u>Miranda</u> warning.  She stated that the

1    drugs she had in her possession were given to her by

2    Mr. Johnson, the other passenger, and he told her to hide the

3    drugs so, you know, the police wouldn't, most likely, wouldn't

4    search her.

5        She also stated that while driving Mr. White slowed the

6    vehicle down and accelerated and at one of the times where he

7    slowed down she saw him throw something out of the window.  She

8    didn't know exactly what it was, but she saw him throw

9    something out of the window.

10       And she also stated that -- I think that was it.

11   Q    Now the firearms and ammunition, were they analyzed by ATF?

12   A    Yes, they were.  Agent Johnson is a nexus expert.  He

13   examined both the firearms and ammunition and determined that

14   they're, they were manufactured outside of North Carolina.

15       So if they were possessed within it, traveled in commerce.

16   Q    And was a fingerprint exam conducted to establish further

17   the defendant had a prior felony conviction at the time he

18   possessed the firearm on December 4, 2013?

19   A    Yes, it was.  And --

20   Q    Specifically, he had a prior conviction for assault with a

21   deadly weapon inflicting serious injury, correct?

22   A    Yes, and firearm by felon.

23   Q    And also, a firearm by felon conviction, correct?

24   A    Yes.

25            MR. RENFER:  Those are all the questions I have, Your

 1  Honor.

 2            THE COURT:  Thank you, sir.

 3            Ms. Dominguez.

 4                      CROSS-EXAMINATION

 5  BY MS. DOMINGUEZ:

 6  Q    Agent Collins, you testified that the, that the police were

 7  looking for a murder suspect in that region of Bonnie Doone?

 8  A    Yes, ma'am.

 9  Q    And that they believed that that suspect was in the car?

10  A    He could possibly be in the car.

11  Q    But he -- but there wasn't -- but they didn't find who they

12  were looking for, correct?

13  A    Correct.

14  Q    And whose car was this Toyota Scion?  Who was it registered

15  to?

16  A    I'm not sure.  It might have been a rental vehicle.

17  Q    But you don't know if it was a rental --

18  A    I don't --

19  Q    -- vehicle or somebody's personal vehicle?

20  A    No, ma'am, I don't know for sure.

21  Q    Do you know if the Fayetteville Police Department are

22  aware, were aware of that fact of whose the, who the vehicle

23  belongs to?

24  A    I'm sure they found out once they ran the registration

25  plate.

1  Q   So you said that Mr. White was the driver, correct?

2  A   Yes, ma'am.

3  Q   And you said that he was in possession of a bag of bullets

4  that you said were his, correct?

5  A   Yes.

6  Q   But they were actually in the door?

7  A   Yes, ma'am.

8  Q   You also testified that those same bullets -- that -- he

9  gave a statement, correct?

10 A   Correct.

11 Q   And that he gave a statement about a Ruger and he gave a

12 statement about the bullets?

13 A   Yes.

14 Q   And you testified that the statement was recorded?

15 A   Yes, ma'am.

16 Q   Have you listened to that recording?

17 A   No.

18 Q   So you don't know if it actually picked up the recordings?

19 Sometimes recordings don't actually, aren't monitored?

20 A   It was a video recording.

21 Q   It's a video recording?

22 A   Yes.

23 Q   Are you aware of whether it's an audible video recording?

24 A   Yes.  You could watch it and you could see it and you can

25 hear it.  I've seen the video.  I just haven't watched the

1  video.

2  Q   Okay.  You've seen the video, but you haven't --

3  A   I've seen it function properly, but I haven't -- I'm not

4  the case agent in this.

5      So I didn't sit down and watch --

6  Q   You did see the video?

7  A   -- second for second.

8  Q   You didn't sit down and watch this specific video, but you

9  have --

10 A   In its entirety, yes.

11 Q   Okay.

12 A   I know there's a video that, that functions like it should.

13 It has Mr. White talking to Agent Johnson and Officer Franklin.

14 Q   Okay.  Were the -- is it customary for the people that are

15 being interviewed to be informed that they're being videotaped?

16 A   No.

17 Q   So the three subjects were interviewed and all of those

18 were videotaped, audio-videotaped?

19 A   Yes.

20 Q   Now you testified that these two firearms were -- well, you

21 testified that the car was eventually at a stop a quarter of a

22 mile past where it was originally seen?

23 A   Probably less than that.

24 Q   Okay.  So it was --

25 A   Short distance.

1  Q    It was a short distance?

2  A    Uh-huh (indicating an affirmative response).

3  Q    So you testified that it kept stopping and slowing down,

4  but it was over a short distance?

5  A    Yes, ma'am.

6  Q    Not, not a quarter of a mile?

7  A    It was a distance within a quarter of a mile, in my

8  opinion, of the area.

9  Q    And so you testified that the officers that had been, I

10  guess, at the original location walked to the secondary

11  location and in that walk they discovered two firearms?

12  A    Yes.  At least one officer, Officer Armstead, walked from

13  where he was to the traffic stop and located the firearms.

14  Q    And so that would have been a walk of less than a quarter

15  of a mile?

16  A    Yes, in my opinion.

17  Q    And this is in a neighborhood in Fayetteville that has gang

18  activity, is what you testified --

19  A    Yes, ma'am.

20  Q    -- to?

21      And these weapons were found in the grass?

22  A    On the side of the road in grass and bushes, foliage area.

23  Q    Okay.  So would they have been visible to the naked eye, or

24  were they kind of --

25  A    Yeah.  They were easily seen.  I -- one was laying in the

1  grass and one was laying on the roadside near some bushes.

2      So on how you word it, it could be in the grass, on the

3  roadside, but they were clearly visible by Officer Armstead.

4  He easily recognized them.  'Cause he didn't know he was

5  looking for guns.

6  Q   So when those guns were retrieved were they swiped for

7  fingerprints?

8  A   They were collected by a forensic technician and they were

9  processed for DNA and latent prints.

10  Q   So both DNA and prints?

11  A   Yes.

12  Q   But those results aren't available at this time?

13  A   If there were any fingerprints on the firearms that could

14  have been compared, they would have been in the file.

15      So there -- no fingerprints were found that could be

16  compared.

17  Q   So the fingerprint portion of this always happens rather

18  fast, but it's the DNA that takes time in the lab?

19  A   Yes.  Well -- I didn't want to get into DNA with the lab,

20  but we don't send DNA to the lab as DNA because they don't

21  compare it like they do fingerprints.  You'd have to send a

22  known sample of DNA with an unknown sample of DNA for the lab

23  to make a comparison.

24      So you can't just send the DNA to the lab.

25  Q   So we're -- so you wouldn't call this a case, then, where

1  we're awaiting DNA analysis?

2  A   No, I would not.

3  Q   And so you testified that Mr. White had this interview and

4  he explained that he received the gun from his, from a deceased

5  person, Cornelius Jackson?

6  A   Yes.

7  Q   And that he had received it a, almost a year and a half

8  prior, or a year and three months prior?

9  A   No.  October 31, 2013 and this happened on December 4,

10 2013.

11 Q   Oh, this is 2013, not 2000 -- oh, okay.

12 A   Yes, ma'am.

13 Q   Sorry.  So just three months prior.

14     And --

15 A   Almost -- just a little over a month.

16 Q   Okay.  Well, the -- and so was Mr. White charged with this

17 from the Fayetteville Police Department?

18 A   Charged with?

19 Q   This firearm?

20 A   Yes.

21 Q   And just was he bonded out of custody or --

22 A   I'm assuming he was 'cause he was -- he was released -- he

23 was out and about when the federal warrants came out.

24     So he had to be located.

25 Q   So do you know if he was released that same day,

1  December --

2  A    Oh, I don't know, ma'am.

3  Q    -- 4, 2013?  Okay.

4       And just so I make sure I understand your testimony, no

5  drugs were found on Mr. White, correct?

6  A    Correct.

7  Q    And no statements were made that connected Mr. White to any

8  drugs that were found in that vehicle, correct?

9  A    Correct.

10             MS. DOMINGUEZ:  No further questions, Your Honor.

11             THE COURT:  Thank you.

12             Mr. Renfer?

13             MR. RENFER:  No redirect, Your Honor.

14             THE COURT:  Very well.

15             You may step down.  Thank you, sir.

16             THE WITNESS:  Thank you, sir.

17             THE COURT:  Is that the evidence for the Government,

18  Mr. Renfer?

19             MR. RENFER:  Yes, Your Honor, plus an argument.  We'll

20  be arguing matters that are in the Pretrial report.

21             THE COURT:  That'll be fine.

22             I'll note for the record I have reviewed the Pretrial

23  Services report.

24             Ms. Dominguez.

25             MS. DOMINGUEZ:  Yes, Your Honor.

1 |       The defense calls Regina White to the stand.

2 |       THE COURTROOM DEPUTY:  Come right up here, please,

3 | ma'am.  Raise your right hand, left hand on the Bible.

4 |              REGINA WHITE, DEFENSE WITNESS, SWORN

5 |       THE COURTROOM DEPUTY:  Have a seat right over there,

6 | please.  And please state your name for the record.

7 |       THE WITNESS:  Regina White.

8 |                    DIRECT EXAMINATION

9 | BY MS. DOMINGUEZ:

10 | Q   Ms. White, how do you know Marcus White?

11 | A   He's my son.

12 | Q   So you're his mother?

13 | A   Yes, ma'am.

14 | Q   Where do you live?

15 | A   Fayetteville, North Carolina.

16 | Q   Do you live in a home?

17 | A   Yes, ma'am.

18 | Q   Who else lives with you at that home?

19 | A   My 86-year-old grandmother.

20 | Q   So your grandmother and Mr. White's great-grandmother --

21 | A   Yes.

22 | Q   -- lives there?

23 | A   Yes.

24 | Q   Are you employed?

25 | A   Yes, ma'am.

1  Q    What's your job?

2  A    I work at Days Inn as a housekeeper.

3  Q    And are your hours -- what are your hours?

4  A    They vary, but I'm pretty much fulltime.  But I work

5  probably about 20 hours a week.

6  Q    You work 20 hours a week?

7  A    Twenty to twenty-five, yes.

8  Q    So not, not fulltime, part time?

9  A    Well, yeah.  Well, yeah.

10  Q    And would you say that a majority of those hours are worked

11  on the weekends or during the week?

12  A    Both.  Varies, like I said.  Sometime they call me -- I'm

13  mainly a weekend person, but I do get week-day hours.

14  Q    And when you're not working are you generally able to be

15  home?

16  A    Yes.

17  Q    Does your 87-year-old grandmother require care?

18  A    Yes.

19  Q    Do you assist in that care?

20  A    Some, and she has home health that comes on three days a

21  week.

22  Q    And so how -- what are the hours of the home healthcare

23  worker in the home?

24  A    They come about 11:00.  They, they stay about an hour and a

25  half.

1  Q    Okay.  And my understanding would be, then, that your

2  grandmother is very often at the home?

3  A    Pretty much, yes, ma'am.

4  Q    Is her health okay?

5  A    Yes, ma'am, pretty much.

6  Q    Other than being elderly, is her health okay?

7  A    Yeah.  Diabetes, you know, high blood pressure.  But she's

8  okay.

9  Q    She able to walk?

10 A    Yeah.

11 Q    And is her mental facilities --

12 A    Yes.

13 Q    -- okay?

14 A    Uh-huh (indicating an affirmative response).

15 Q    Prior to Mr. White being in custody here, he wasn't living

16 with you at that time, correct?

17 A    No.

18 Q    But we have discussed that you would be willing to have him

19 live with you in your home --

20 A    Yes.

21 Q    -- correct?

22 A    Yes.

23 Q    And you've talked about that with your grandmother and --

24 A    Yes.

25 Q    -- and she agrees that if he --

1    A    Yes, ma'am.

2    Q    -- is able to live in the home?

3    A    Yes, ma'am.

4    Q    We've also talked with you about what it means to be a

5    third-party custodian, is that true?

6    A    Yes.

7    Q    And we told you that as a third-party custodian if this

8    Court were to allow Mr. White to go live with you you would be

9    responsible to report to the Court and to his probation officer

10   if he were to violate --

11   A    Right.

12   Q    -- the conditions of his release?

13   A    Yes.

14   Q    We talked to you --

15   A    Yes.

16   Q    -- about that?

17   A    Yes, ma'am.  Yes, ma'am.

18   Q    And you agreed that you would be willing to do that?

19   A    Yes, ma'am.

20   Q    And we also talked to you about the importance of him being

21   in court when he's required to be in court, correct?

22   A    Yes, ma'am.

23   Q    And you also would have the ability to make sure he makes

24   his court appearances?

25   A    Yes, ma'am.

1    Q    Do you have a vehicle?

2    A    Yes.

3    Q    And you have a driver's license, correct?

4    A    Yes, ma'am.

5    Q    Now your home has three bedrooms, so is one of those rooms

6    available for him?

7    A    Yes.

8    Q    You don't have any firearms in your home --

9    A    No.

10   Q    -- correct?

11   A    No, ma'am.

12   Q    You do not allow illegal drugs --

13   A    No.

14   Q    -- in your home, correct?

15   A    No, ma'am.

16   Q    Do you have a, what, what we call a landline telephone --

17   A    Yes.

18   Q    -- in your home?

19        And if this Court were to release your son with electronic

20   monitoring, would you be willing to have special features

21   removed from your landline telephone, like Call Waiting, so

22   that that system could be set up?

23   A    Uh-huh, yes, ma'am.

24   Q    Do you also have a cell phone?

25   A    Yes, ma'am.

1   Q    Do you get cellular service where you live?

2   A    Yes, ma'am.

3   Q    Are you aware of your son's prior criminal convictions?

4   A    Yes, ma'am.

5   Q    You're aware that, then, that he's been convicted of the,

6   in the past for serious charges?

7   A    Yes, ma'am.

8   Q    His last, his last serious charge or his last charge was a

9   misdemeanor charge of possession of drug paraphernalia, do you

10  remember that, in 2012?

11  A    Yes.

12  Q    He got released --

13  A    Yes.

14  Q    -- from 45 days of custody in March --

15  A    Uh-huh (indicating an affirmative response).

16  Q    -- of 2013?

17  A    Yes, ma'am.

18  Q    Are you aware that he's had trouble when he's been on

19  probation in the past with meeting his obligations?

20  A    Yes, ma'am.

21  Q    Would you do everything in your power to ensure that he

22  meets his obligations if this Court were to release him?

23  A    Yes, ma'am.

24  Q    Do you feel like your son respects you?

25  A    Yes, ma'am.

1  Q    Do you feel like he listens to you?

2  A    Yes, ma'am.

3            MS. DOMINGUEZ:  No further questions, Your Honor.

4            THE COURT:  Thank you, ma'am.

5            Mr. Renfer?

6            MR. RENFER:  Thank you, Your Honor.

7                           CROSS-EXAMINATION

8  BY MR. RENFER:

9  Q    Ma'am, what's the address where you currently live?

10 A    210 Early Street.

11 Q    So -- and how long have you lived at that address?

12 A    About 2-1/2 years.  Two, three years.

13 Q    And, ma'am, when, when the defendant was about 17 or 18

14 years old, you know, about eight years ago, was he living with

15 you, primarily?

16 A    Yes.

17 Q    And when he was, you know, up through, maybe, 21 years old,

18 was he still living with you then, primarily?

19 A    Yes.

20 Q    So when he was, committed the offense and was convicted of,

21 you know, felony breaking and entering and felony larceny in

22 2007 he was living with you when he committed that offense --

23 A    Yes.

24 Q    -- and was convicted, right?

25 A    Uh-huh (indicating an affirmative response).

1  Q   And then in 2009 when he committed the offense of assault

2  with a deadly weapon inflicting serious injury and was

3  convicted of that he was living with you primarily then as

4  well, correct?

5  A   Yes.

6  Q   And same thing with the firearm by a felon conviction, same

7  time frame in 2009, he was still living with you, correct?

8  A   I --

9  Q   Which goes, basically, you know, from May until, from May

10 2009 to October 2010, roughly.

11 A   Yeah, I think so.

12 Q   He was living with you primarily, correct?

13 A   I think so, yes.

14 Q   And so when he was on probation for those offenses he was

15 living with you at that time, correct?

16 A   For which offense?

17 Q   Well, for the one in 2007 when he was 18.  He got put on

18 probation.

19 A   Yes.

20 Q   He was living with you primarily --

21 A   Yes.

22 Q   -- then, correct?

23     And then when he got -- he was on, put on post-release

24 supervision in 2012.

25     So he went to prison in about 2010, got out in 2012.  When

1 | he got out, did he move in with you then?

2 | A    Yes.

3 | Q    Okay.  And so he was on post-release supervision, you know.

4 | When he got out of prison he was living with you, correct?

5 | A    Yes.

6 | Q    And, ma'am, what, if anything, did the defendant tell you

7 | about this charge, though, the gun charge in December 2013?

8 | A    Nothing, really, that he just got pulled in a traffic stop.

9 | Q    And he was living with you in December of 2013 as well?

10 | A    No.

11 | Q    He wasn't?  He'd already moved out?

12 | A    Uh-huh (indicating an affirmative response).

13 | Q    What about October of 2013?  Do you know if he was living

14 | with you then?

15 | A    No.  I think he was with his daughter's mother then.

16 | Q    Okay.

17 |         MR. RENFER:  May I have a moment, Your Honor?

18 |         THE COURT:  You may.

19 |     (Pause)

20 |         MR. RENFER:  Those are all the questions I have, Your

21 | Honor.

22 |         THE COURT:  Thank you, sir.

23 |         Ms. Dominguez?

24 |         MS. DOMINGUEZ:  Thank you, Your Honor.

25 |                         REDIRECT EXAMINATION

 1  BY MS. DOMINGUEZ:

 2  Q    The prosecutor asked you about a larceny after a breaking

 3  and entering from when your son was 18 years old.  He also

 4  asked you about an assault with a deadly weapon from when he

 5  was 21 years old?

 6  A    Uh-huh (indicating an affirmative response).

 7  Q    Asked you if he was living with you at that time, correct?

 8  A    (No audible response.)

 9  Q    None of those offenses took place at your home?

10  A    No.

11  Q    Now he also asked you questions about when your son has

12  previously been on probation, correct?

13  A    (No audible response.)

14  Q    In any of his previous probations, have you been tasked

15  with the responsibility to report his violations to the Court?

16  A    Yes.

17  Q    You have been under a court -- you've signed documents

18  saying that, "I am responsible" --

19  A    Oh, no, no.  No.

20  Q    So this would be the first time --

21  A    Yes.

22  Q    -- that you would be accepting responsibility to, to report

23  violations?

24  A    Right, yes.

25  Q    You were not under that same obligation --

1  A    No.

2  Q    -- in the past?

3  A    No.

4           MS. DOMINGUEZ:  No further questions, Your Honor.

5           THE COURT:  Thank you.

6           Any follow-up, Mr. Renfer?

7           MR. RENFER:  No, Your Honor.

8           THE COURT:  Very well.

9           Thank you, ma'am.  You may step down.

10          THE WITNESS:  You're welcome.  Thank you.

11          THE COURT:  Ms. Dominguez, ma'am, is that the evidence

12 for the defendant?

13          MS. DOMINGUEZ:  That is, Your Honor.

14          THE COURT:  I'll be happy to hear your argument at

15 this time.

16          MS. DOMINGUEZ:  My argument?

17          THE COURT:  Yes, ma'am.

18          MS. DOMINGUEZ:  Yes, Your Honor.

19          We believe that there are conditions that this Court

20 could set that would reasonably assure the safety of the

21 community, safety of anyone and the community, and his

22 appearance.

23          With respect to appearance, he has had violations of

24 probation in the past, but with his mother ensuring that he

25 will, that she will bring him to court.  I'm unaware of any

1  violations that involve his failure to appear at this point.

2  I'm not, I'm unaware of that, but so -- well, the report does

3  say there are histories of failure to appear, failures to

4  appear.  I just don't actually have, see them at this point.

5         But we believe that if he goes to his mother's home in

6  a very restricted setting, on an ankle bracelet, perhaps even

7  home incarceration, that there are conditions that could be set

8  that will ensure that he does appear as he's instructed to

9  appear for court.  And, of course, she is a third-party

10  custodian and agrees that she will be part of that process.

11        With respect to his danger, I would note that he has

12  seemingly been out for the past year, year plus I suppose, and

13  I am not seeing that there have been violations in that time,

14  or criminal conduct other than this criminal conduct.  And, of

15  course, he was cooperative in that interview that they say is

16  tape recorded.  He -- there isn't any kind of evidence of these

17  firearms being used, even if you take the Government's evidence

18  on its face.  He said that he had that firearm for protection.

19        Obviously, the Court is going to be concerned with

20  prior arrests and defense counsel's adequately aware of that,

21  but we would say that if you impose the most stringent

22  conditions, that there would be conditions that could be set.

23  The most stringent conditions of home incarceration would still

24  allow him to effectively be represented by counsel and consort

25  with his counsel and it would also be the most, least

1  restrictive way to handle this situation.

2        So we ask that you release him to the custody of his

3  mother and allow him to proceed with this criminal proceeding.

4        Thank you, Your Honor.

5        THE COURT:  Thank you, ma'am.

6        Mr. Renfer, is the Government seeking detention on

7  both flight and danger grounds?

8        MR. RENFER:  Yes, Your Honor.

9        THE COURT:  And is the -- what is the basis for the

10  contention with respect to flight, his prior record on --

11        MR. RENFER:  It --

12        THE COURT:  -- post-conviction release?

13        MR. RENFER:  That, as well as the numerous failures to

14  appear, which are on Page 5 of the Pretrial report.  When it

15  lists under Other Arrests, that second full paragraph is a list

16  of offenses for which he failed to appear, Your Honor.  And not

17  just one of them, the whole list is contained in that

18  paragraph, which, conservatively, are about 20 to 30 --

19        THE COURT:  Uh-huh (indicating an affirmative

20  response).

21        MR. RENFER:  -- offenses.

22        And, of course, he got a full hearing.

23        THE COURT:  Okay.  Very well, sir.  Thank you.

24        MS. DOMINGUEZ:  In response, Your Honor, I would just

25  note that, you know, I regret not seeing it that way before,

1  but I would note that all of those are of the traffic variety

2  offenses and none are more serious criminal proceedings.

3        THE COURT:  Very well.

4        Folks, I have considered carefully the evidence and

5  argument that has been considered.  Based on the record

6  developed before me, I believe the law requires me to allow the

7  Government's motion.

8        I do so finding that the Government has shown by clear

9  and convincing evidence that there's no condition or

10 combination of conditions that will reasonably assure the

11 safety of any other person and the community and that by a

12 preponderance of the evidence that it's shown that there's no

13 condition or combination of conditions that will reasonably

14 assure the appearance of the defendant, as required.

15       Mr. White, sir, my ruling does not affect the

16 presumption of innocence which you will continue to enjoy at

17 the trial in your case.

18       On a motion such as this, the Court is required to

19 consider certain specific factors.  I have considered the

20 factors the law requires me to consider.

21       One is the weight of the evidence and I believe the

22 Government has shown that it has a strong case against you.

23 That would include the observations by the officers on the

24 scene, the recovery of the firearms, and then your statement at

25 least with respect to the Ruger pistol.

1    I'm required to consider the nature and circumstances

2  of the offense.  This is a firearms-related offense and it

3  involves somebody who, according to the law, is not permitted

4  to have firearms.

5    So that represents a danger to the community.  The

6  fact that there was ammunition in the car and that the gun was

7  being used for protection, so to speak, because you were

8  traveling through an area known for violence I think enhances,

9  is concerning for obvious reasons, that it indicates that there

10  was a real potential that the firearm would have been used.  It

11  wasn't and I do take note of that and that is a mitigating

12  factor, obviously.  But this is -- it contrasts with the

13  circumstance, say, where a gun is just sitting on a shelf and

14  never touched.  This gun was, in that sense, being used.

15    I also noted that in your statement to the police you

16  indicated that you were an awareness that you were not

17  permitted to have a gun; hence, your storing it when you were

18  at your home in the woods.

19    So I do think that, while you're obligated,

20  nonetheless, I think your awareness of it and conscious

21  disregard of that requirement is something of an aggravating

22  factor.

23    I'm required to consider your history and

24  characteristics.  And here, of course, your -- what strikes,

25  stands out is your criminal record, the four felony

1  convictions, three misdemeanor convictions, two, what I would

2  call, probation revocations.  One might not have been purely

3  probation, but it was post-conviction release revocation and in

4  both instances for fairly extensive violations.

5          With respect to the probation after the, for the post-

6  release revocation after, I should say the post-conviction

7  release dealing with assault with a deadly weapon inflicting

8  serious injury, the violations there included possession of a

9  firearm, deadly weapon or explosive, new felony conduct, and

10  absconding.  And those are all pretty serious matters,

11  obviously.  And that was in 2009.

12          So it's not -- actually, the revocation was in 2012.

13  That's not terribly long ago.  And then, of course, there was a

14  subsequent revocation as well, I believe.

15          I also take note of the fact that these -- actually,

16  there was a prior revocation, not a subsequent one.

17          I take note of the nature of these, that the felony

18  convictions, you know, I've mentioned assault with a deadly

19  weapon and then subsequent to that the felon in possession of a

20  firearm.  And then here we are again on an issue of firearm

21  possession.

22          So that, that's troubling that notwithstanding service

23  of a term of imprisonment in connection with the felon in

24  possession of a firearm charge, that was not a deterrent to

25  that specific conduct.  And you were released from that term of

1   imprisonment relatively recently, in 2012, and then the next

2   year the offense occurs again.

3           And that's, that's significant in the detention

4   context because, or the issue of detention because the greatest

5   sanction, really, for, in a detention context is to revoke the

6   release and return a defendant to jail pending trial.  And if,

7   if a prison term of some months is not, did not deter you from

8   possessing a firearm, it, it undermines the Court's confidence

9   that the threat of being revoked at pre-trial release would,

10  would be effective in deterring you from that conduct.

11          I also make note of the considerable failures to

12  appear with respect to the issue of flight risk.  I did take

13  note -- it's a point well taken -- that those were motor

14  vehicle, with respect to motor vehicle-related violations.

15  Nonetheless, a failure to appear is a failure to appear and I

16  think if one looks at that, combined with the general pattern

17  of disregard of the law, it undermines the Court's confidence

18  with respect to your appearing.

19          I'm required to consider the nature and seriousness of

20  the danger posed by your release.  I think there's a clear

21  danger here of continued possession of firearms and the risk

22  associated with that.

23          The third-party custodial arrangement that is proposed

24  is not suitable for a number of reasons.  One is your mother's

25  working, so you would be home alone for a considerable -- I say

1  "alone."  She wouldn't be there.  Your grandmother, I assume,

2  would be there, but from the evidence she's not in a position

3  to supervise you.  She's not being proposed for that -- and so

4  you would be unsupervised on a regular basis during the week,

5  which is certainly not ideal and the proposed custodial home is

6  in the same community where this alleged conduct occurred.  And

7  the fact is you've been at that same home and engaged in, in

8  other felonious conduct.

9       So whatever the dynamics of the household are, they've

10  not in the past been effective in deterring you from criminal

11  conduct.  I don't -- I know that your mother hasn't been in a

12  formal role as a custodian, but that does tend to undermine the

13  Court's confidence that even placing in her role, given the

14  prior conduct that has come out of that household, that it

15  would be effective in deterring you from further criminal

16  conduct of this type.

17       Sir, those are the principal reasons for my decision.

18  I will be entering a written order in this matter.

19       Ms Dominguez, anything further on behalf of Mr. White

20  at this time?

21       MS. DOMINGUEZ:  No, Your Honor.

22       THE COURT:  Thank you.

23       Mr. Renfer, sir, anything further for the Government

24  at this time?

25       MR. RENFER:  No, Your Honor.

1          THE COURT:  Very well.

2          I remand the defendant to the custody of the United

3    States Marshal.

4        (Proceedings included at 10:59 a.m.)

5

6

7

8                          CERTIFICATE

9          I, court approved transcriber, certify that the

10   foregoing is a correct transcript from the official electronic

11   sound recording of the proceedings in the above-entitled

12   matter.

13   /s/ Janice Russell                    May 8, 2015

14   Janice Russell, Transcriber                    Date

15

16

17

18

19

20

21

22

23

24

25